# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| LUMINOR CONSULTING CORP.; | ) | |
| DLC ELITE LENDING CORPORATION; | ) | |
| HEARD CONCRETE CONSTRUCTION | ) | |
| CORP.; THOMAS DAVIS; | ) | |
| KEVIN HARRISON, | ) | Civil Action No. 3:22-CV-00555 |
| | ) | |
| Plaintiffs, | ) | Judges Richardson and Frensley |
| | ) | |
| v. | ) | Jury Demanded |
| | ) | |
| DR. ADEL ELMESSIRY and | ) | |
| WEBDBTECH, INC., | ) | |
| | ) | |
| Defendants/Counterplaintiffs/ | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LUMINOR CONSULTING CORP.; | ) | |
| HEARD CONCRETE CONSTRUCTION | ) | |
| CORP., TOM DAVIS, and | ) | |
| JEFFREY HOU YIN HO, | ) | |
| | ) | |
| Counterdefendants, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| EMTECH, ROB ABENANTE, and | ) | |
| ANISH PABARI, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

---

## ADEL ELMESSIRY'S FIRST AMENDED COUNTERCLAIM
## AND THIRD-PARTY COMPLAINT

---

Dr. Adel ELMessiry ("Dr. ELMessiry"), by and through counsel, submits this First Amended Counterclaim and Third-Party Complaint:

## INTRODUCTION

Dr. Adel ELMessiry and the company he partially owns, WebDBTech, are the victims in this matter. Dr. ELMessiry was solicited by three individuals: Anish Pabari, Rob Abenante, and Tom Davis to enter into a partnership related to the creation of the ROBe2 Protocol. The partnership engaged WebDBTech for its expertise in software development and Blockchain technology and demanded a fast timeline to create the ROBe2 Protocol. WebDBTech fully performed and delivered its product in the form of Non-Fungible Tokens for investors. During this time, Pabari, Abenante, and Davis hatched a scheme to take WebDBTech public and use it to sell the ROBe2 Protocol. However, Dr. ELMessiry discovered that the true intentions of his partners were to use WebDBTech as the vehicle for a means to scam its investors. When Dr. ELMessiry refused to allow WebDBTech to be used in this manner, his partners turned on him and refused to pay the debt owed to WebDBTech for its services. In addition to not paying their debt, Pabari, Abenante and Davis have profited from investors in the ROBe2 Protocol but have neither given Dr. ELMessiry his share of the profits nor paid WebDBTech what is owed.

## COUNTERCLAIM AND THIRD-PARTY COMPLAINT

Wherefore, Dr. Adel ELMessiry assumes the role of Counterplaintiff and Third-Party Plaintiff and brings the following Counterclaim and Third-Party Complaint in this matter against the Plaintiff/Counterdefendant and Third-Party Defendants identified below:

## PARTIES

1.      Dr. ELMessiry is an individual located at 9370 Bournsmouth Ct., Brentwood, Tennessee 37027.

2.      Tom Davis is a Plaintiff in this matter subject to this Counterclaim.

3.      Anish Pabari is a partner in this matter and should be included as a Third-Party Defendant.

4.      Rob Abenante is an individual located at 2615 Pioneer Way Port Coquitlam BC V3C 5Y6 Canada, Vancouver, B.C. Canada.  Abenante is a partner in this matter and should be included as a Third-Party Defendant.

5.      Davis is a Counterdefendant.

6.      Collectively, Abenante and Pabari are the Third-Party Defendants.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy, excluding interest and costs, exceeds $75,000.

8.      This Court has personal jurisdiction over the Counterdefendant and Third-Party Defendants because, among other reasons, they subjected themselves to the jurisdiction of this State by transacting business in Tennessee with Dr. ELMessiry.

9.      Venue is proper in this Court because, among other reasons, this is a compulsory counterclaim and under 28 U.S.C § 1391, a substantial portion of the events giving rise to this claim occurred in this State, which is the residence of Dr. ELMessiry.

## FACTS

10.     Dr. ELMessiry entered into an oral partnership with Counterdefendant Davis and Third-Party Defendants Pabari and Abenante to develop the software protocol necessary for the development of an innovative, renewable energy based Blockchain software protocol called Renewable Obligation Base Energy Economy (the "ROBe2 Protocol").

3

11.     WebDBTech was hired to perform this work in an aggressive timeline, such that it had to primarily focus only on the ROBe2Protocol to the exclusion of other projects.

12.     WebDBTech was engaged to do this by the partnership comprised of Dr. ELMessiry, Thomas Davis, Rob Abenante, and Anish Pabari.

13.     WebDBTech also had four written contracts for the performance of portions of the ROBe2Protocol.

14.     Those contracts were with 1.) EMTech (alter ego of Heard and Davis) for the sum of $400,000, attached hereto as Exhibit A; 2.) Anish Pabari for the sum of $200,000, attached hereto as Exhibit B; 3.) Jeffrey Hou Yin Ho (acting on behalf of Pabari) for the sum of $200,000, attached hereto as Exhibit C; and 4.) Luminor Consulting Corp. (Abenante's company) for the sum of $280,000, attached hereto as Exhibit D.

15.     The Luminor and EMTech contracts with WebDBTech were unsigned. Both the Luminor and EMTech contracts were assented to by the parties to be charged.

16.     None of the contracting parties in Exhibits A – D have paid their full contracted amount.

17.     WebDBTech was paid a total of $698,647 for a portion of this work. That payment was made as follows: $266,000 from EMTech via Heard for the benefit of Tom Davis; $265,980 paid by various individuals for the benefit from Anish Pabari; and $166,667 paid by Luminor Consulting for the benefit of Rob Abenante.

18.     WebDBTech is still owed $1,600,753 for the work it did for the ROBe2 Protocol. Of that amount, Counterdefendant Davis and Third-Party Defendants Pabari and Abenante owe $1,000,753.

19.     WebDBTech continues to incur expenses for the maintenance of the ROBe2Protocol for which it is not being compensated. Currently, the maintenance for the software is $50,000 per month, but that amount will increase in January of 2023.

20.     In addition, Dr. ELMessiry and WebDBTech incurred several thousand dollars of needless accounting bills required by the partnership for its plan to turn WebDBTech into a public company.

21.     Dr. ELMessiry and WebDBTech have fully performed their work on the ROBe2 Protocol and have timely delivered the Non-Fungible Tokens ("NFTs) to the investors in the protocol and the partners. The only remaining deliverables are to turn over the software and the keys to the protocol. WebDBTech has offered to do this many times upon resolution of the outstanding debt, but Pabari, Abenante and Davis have refused its offers.

22.     Dr. ELMessiry and WebDBTech continue to suffer financially as a result of the acts committed by Counterdefendant and Third-Party Defendants due to its ongoing costs for the ROBe2 Protocol and the services which have not been paid related to the ROBe2 Protocol, plus its lost opportunity costs for the work it performed in a compressed timeline.

23.     Furthermore, Counterdefendant and Third-Party Defendants are believed to have received investments related to the ROBe2 Protocol that have not been shared with the entire partnership. An article indicating this investment has been attached as Exhibit E.

**CAUSES OF ACTION**

**COUNT I – BREACH OF FIDUCIARY DUTY AND/OR**
**BREACH OF OBLIGATION OF GOOD FAITH AND FAIR DEALING**
**(Against Pabari, Davis and Abenante)**

24.     Dr. ELMessiry realleges and incorporates by reference the allegations above.

25.     Pabari, Davis and Abenante induced Dr. ELMessiry into a partnership to develop the ROBe2 Protocol.

26.     As members of the partnership, Pabari, Davis and Abenante owed fiduciary duties to, and/or had an obligation of good faith and fair dealing with, Dr. ELMessiry. *See* Tenn. Code Ann. § 61-1-404.  Pabari, Davis, and Abenante promised to provide funding for the creation of the ROBe2 Protocol.

27.     Dr. ELMessiry relied upon the promise by Pabari, Davis and Abenante to provide funding to WebDBTech for the creation of the ROBe2 Protocol by setting aside all other projects and dedicating the full amount of his time towards the development and creation of the ROBe2 Protocol.

28.     Dr. ELMessiry's time and dedication caused him to expend capital and to forego other business opportunities to his detriment.

29.     Dr. ELMessiry has performed the services agreed upon by the partnership.

30.     Pabari, Davis, and Abenante intentionally failed to pay WebDBTech, causing the ROBe2 Protocol to not be implemented as planned, even though the ROBe2 Protocol was completed.

31.     Pabari, Davis, and Abenante have intentionally failed to live up to their obligations to the partnership.  Pabari, Davis and Abenante have breached their fiduciary duties owed to Dr. ELMessiry, as a partner, by preventing the ROBe2 Protocol from being fully implemented causing financial injury to Dr. ELMessiry and the partnership.  This also constitutes a breach of their obligation of good faith and fair dealing.

32.     Furthermore, as a result of these breaches of fiduciary duties, Dr. ELMessiry has expended time and capital developing the ROBe2 Protocol and been injured by being denied any profits from the delivery of the ROBe2 Protocol, plus interest.

### COUNT II – BREACH OF FIDUCIARY DUTY AND/OR
### BREACH OF OBLIGATION OF GOOD FAITH AND FAIR DEALING
### (Against Pabari, Davis and Abenante)

33.     Dr. ELMessiry realleges and incorporates by reference the allegations above.

6

34.     Pabari, Davis and Abenante induced Dr. ELMessiry into a partnership to develop the ROBe2 Protocol.

35.     As members of the partnership, Pabari, Davis, and Abenante owed fiduciary duties to, and or had an obligation of good faith and fair dealing with, Dr. ELMessiry. *See* Tenn. Code Ann. § 61-1-404.

36.     Pabari, Davis and Abenante used the ROBe2 Protocol to solicit outside investment to the partnership.

37.     Exhibit E shows that they were successful in receiving outside investment related to the business of the partnership.

38.     Dr. ELMessiry, as a partner with Pabari, Davis and Abenante, was entitled to receive a benefit from this investment.

39.     Unfortunately, his partners did not share the benefit of these investments with the partnership or Dr. ELMessiry.

40.     These actions benefited Pabari, Davis and Abenante and are a breach of their fiduciary duty to Dr. ELMessiry and the partnership, as well as a breach of their obligations of good faith and fair dealing

41.     The failure to share the benefit of the investment with Dr. ELMessiry caused injury to Dr. ELMessiry and the partnership.

## COUNT III - UNJUST ENRICHMENT
### (Against Pabari, Davis, and Abenante)

42.     Dr. ELMessiry realleges and incorporates by reference the allegations above.

43.     Dr. ELMessiry has dedicated his time and money to the furtherance of the Partnership and towards the development of the ROBe2 Protocol.

7

44.     Based on Exhibit E and other publicized media articles and signed investor acknowledgements, Pabari, Davis and Abenante have obtained investors for the ROBe2 protocol.

45.     Pabari, Davis, and Abenante have received large capital investments related to the promise of delivering the ROBe2 protocol.

46.     In addition, other investors, Pabari, Davis, and Abenante have been given NFTs that have been tied to the promise of a completed ROBe2 protocol.

47.     Wallets were created by WebDBTech for investors, Pabari, Davis and Abenante to receive these NFTs.

48.     Pabari, Davis and Abenante have received NFTs and, upon information and belief, large sums of investment money premised upon the delivery of a completed ROBe2 protocol.

49.     Pabari, Davis and Abenante have intentionally not used these funds towards the completion of the ROBe2 protocol and have not shared any of the proceeds from investors with Dr. ELMessiry.

50.     By failing to pay what is owed to the partnership, Pabari, Davis and Abenante have been unjustly enriched by the funds received from these investors and the NFTs provided to Pabari, Davis, and Abenante and the investors.

51.     It is unjust and inequitable for Pabari, Davis and Abenante to receive these proceeds and NFTs without giving Dr. ELMessiry his share of the funds.

## PRAYER FOR RELIEF

WHEREFORE, Dr. ELMessiry prays for the following relief:

A. Judgment in favor of Dr. ELMessiry and against Counterdefendant and Third-Party Defendants on all the causes of action alleged above;

B. All monetary damages in an amount to be determined at trial for which it is entitled under the causes of action alleged above;

C. Compensatory damages in an amount to be determined by the trier of fact to be fair and reasonable;

D. Prejudgment and post-judgment interest;

E. Reasonable attorney fees, expenses and costs; and

F. Such other, further and general relief as this Court deems just and equitable.

## **<u>REQUEST FOR JURY TRIAL</u>**

Dr. ELMessiry hereby makes a demand for a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

/s/ Tara L. Swafford
THE SWAFFORD LAW FIRM, PLLC
Thomas Anthony Swafford BPR #17578
Tara L. Swafford BPR #17577
Elizabeth G. Hart, BPR #30070
321 Billingsly Court, Suite 19
Franklin, Tennessee 37067
Telephone: (615) 599-8406
Facsimile: (615) 807-2355
tony@swaffordlawfirm.com
tara@swaffordlawfirm.com
betsy@swaffordlawfirm.com

*Counsel for Defendants*

9

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing document has been served via email, U.S. Mail, or the Court's Electronic Filing System on:

Charles H. Williamson
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville, TN 37219
charley.williamson@wallerlaw.com

Christopher D. Davis
Destinee B. Byers
DAVIS LAW, PLC
555 Bellaire Ave., Ste. 340
Chesapeake, Virginia 23320
chris@davislawplc.com
destinee@davislawplc.com

this 11th day of January, 2023.

/s/     Tara L. Swafford
Tara L. Swafford

10

# EXHIBIT A

# Software Development Services Agreement

This Software Development Services Agreement (the "Agreement") is entered into the date set forth on the signature page by and between EMTECH (the "Company") and the undersigned, WebDbTech, LLC ("Developer").

The parties agree as follows:

1. **Services**. Developer agrees to act as a software developer to the Company and provide its services to the Company from time to time as mutually agreed to by the parties (collectively, the "Services").

2. **Compensation**. As full and complete consideration of the Services to be rendered hereunder, the Company shall pay Developer for its Services at the agreed rate of FOUR HUNDRED THOUSAND DOLLARS ($400,000).

3. **Expenses**. The Company shall promptly reimburse Developer for any reasonable costs and expenses incurred by Developer in connection with any Services specifically requested by the Company and actually performed by Developer pursuant to the terms of this Agreement. Each such expenditure or cost shall be reimbursed only if: (i) with respect to costs in excess of $50, individually, Developer receives prior approval from the Company's CEO for such expenditure or cost, and (ii) with respect to costs in less than $50, individually, provided Developer furnishes to the Company adequate records and other documents reasonably acceptable to the Company evidencing such expenditure or cost.

4. **Term and Termination**. The term of this Agreement shall continue until terminated by either party for any reason upon written notice without further obligation or liability except obligations already incurred with respect to Compensation. Notwithstanding the foregoing, to provide the parties with adequate operational lead time, they agree to provide each other with at least one (1) month's prior written notice in the event of termination.

5. **Independent Contractor**. Developer's relationship with the Company will be that of an independent contractor and not that of an employee. Developer will not be eligible for any employee benefits, nor will the Company make deductions from payments made to Developer for employment or income taxes, all of which will be Developer's responsibility. Developer will have no authority to enter into contracts that bind the Company or create obligations on the part of the Company without the prior written authorization of the Company. Similarly, the software developers assigned work pursuant to this Agreement are Independent Contractors working at the request of Developer and will not be employed by Company without prior notice to and approval by Developer.

6. **Nondisclosure of Confidential Information**.

a. **Agreement Not to Disclose**. Developer agrees not to use any Confidential Information (as defined below) disclosed to Developer by the Company for Developer's own use or for any purpose other than to carry out discussions concerning, and the undertaking of, the Services. Developer agrees to take all reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information of the Company in order to prevent it from falling into the public domain or the possession of persons other than agents of the Company or persons to whom the Company consents to such disclosure. Upon request by the Company, any materials or documents that have been furnished by the Company to Developer in connection with the Services shall be promptly returned by Developer to the Company.

b. **Definition of Confidential Information**. "Confidential Information" means any information, technical data or know-how of, or disclosed by, the Company to Developer (whether disclosed before or after the date of this Agreement), including, but not limited to, information relating to business and product or service plans, financial projections, customer lists, business

forecasts, sales and merchandising, human resources, patents, patent applications, computer object or source code, research, inventions, processes, designs, drawings, engineering, marketing or finance, which is indicated when disclosed to be confidential or proprietary or which information would, under the circumstances, appear to a reasonable person to be confidential or proprietary. Confidential Information does not include information, technical data or know-how that: (i) is in the possession of Developer at the time of disclosure, as shown by Developer's files and records immediately prior to the time of disclosure; or (ii) becomes part of the public knowledge or literature, not as a direct or indirect result of any improper inaction or action of Developer. Notwithstanding the foregoing, Developer may disclose Confidential Information with the prior written approval of the Company or pursuant to the order or requirement of a court, administrative agency or other governmental body.

7.  **No Rights Granted**. Nothing in this Agreement shall be construed as granting any rights under any patent, copyright or other intellectual property right of the Company, nor shall this Agreement grant Developer any rights in or to the Company's Confidential Information, except the limited right to use the Confidential Information in connection with the Services.

8.  **Assignment of Intellectual Property**. To the extent that Developer jointly or solely conceives, develops or reduces to practice any new inventions, original works of authorship, developments, concepts, know-how, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws or other intellectual property which would be deemed to be Confidential Information of the Company (collectively, "<u>Intellectual Property</u>") which clearly relates to the Company's business or technology and has been created by the Developer solely in the course of the performance of Services such as in correspondence, e-mails, meetings or meetings relating to the Company, Developer hereby acknowledges that it is "work made for hire" for the benefit of the Company and hereby assigns all rights, titles and interest to such Intellectual Property to the Company.

9.  **Duty to Assist**. As requested by the Company and only with respect to Intellectual Property created by Developer for the Company as provided in paragraph 8 above, Developer shall take all steps reasonably necessary to assist the Company in obtaining and enforcing in its own name any such Intellectual Property right. Developer's obligation to assist the Company shall continue beyond the termination of Developer's relationship with the Company, but the Company shall compensate Developer at a reasonable rate after the termination of such relationship for time actually spent at the Company's request providing such assistance.

10. **Company's Right to Disclose.** The Company shall have the right to disclose the existence of this Agreement, Developer's status as an Developer, and to include Developer's name, image and profile in various promotional materials, including, but not limited to, executive summaries, private placement memo, or offering materials, and the Company's world wide web page.

11. **No Conflicts; Non-Compete**. Developer hereby represents, warrants and covenants that Developer has the right, power and authority to enter into this Agreement and that neither the execution nor delivery of this Agreement, nor the performance of the Services by Developer will conflict with or result in a breach of the terms, conditions or provisions of, or constitute a default under, any contract, covenant or instrument under which Developer is now or hereinafter becomes obligated. During the term of this Agreement, Developer shall not provide any services, as an employee, Developer or otherwise, to any person, company or entity that is (or proposes to be) a business activity that is in conflict with or directly related to the business in which the company is now involved or becomes involved during the term of this Agreement.

12. **Miscellaneous**. Any term of this Agreement may be amended or waived only with the written consent of the parties. This Agreement, including any schedules hereto, constitute the sole agreement of the parties and supersedes all oral negotiations and prior writings with respect to the subject matter hereof. The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Delaware without

giving effect to the principles of conflict of laws. This **Agreement** may be executed in counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

### Services

The scope of this agreement is limited to the following services:

- Software development in relation with the company proposed website changes.
- Evaluating blockchain use in creating immutable track of the renewable energy.
- Token Design
  - Research token base concepts
  - Create several base script a,b, and c
  - Implement a,b, and c base contracts
  - Simulate the base concept contracts
  - QA the transactions
  - Redesign the final token design
  - Deploy the design contract on the test network
  - Test transactions
  - Modifications and updates
- Smart Contract
  - Research selected smart contract
  - Validate reflection
  - Create 4 way reflection model
  - Create 3 way reflection model
  - Create 2 way reflection model
  - Create testing model
  - Deploy the contracts on test network
- Token Mining
  - Design the mining pool
  - Design the RAMP
  - Design the operational aspect
  - Design the rewards system
  - Design the algorithm
  - Build the prototype
  - Update the Contract
- NFT Bounds Offering
  - Design the NFT Bounds for ROBe[2]
  - Custome develop each NFT from scratch
  - Create the registration system
  - Deploy the NFTs
- Test Network Deployment
- Main Network Deployment

**SIGNATURES ARE ON THE PAGE TO FOLLOW**

**Signature Page**

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of __June 1st___, 2021 (the "Effective Date").

| **EMTECH** | **WebDbTech LLC** |
|---|---|
| By: _____ | By: _____ |
| Name: Tom Davis | Name: |
| Title: Partner | Title: CEO |
| Dated: December 9, 2021 | Dated: _____ |

# EXHIBIT B

## Software Development Services Agreement

This Software Development Services Agreement (the "Agreement") is entered into the date set forth on the signature page by and between Anish Pabari (the "Company") and the undersigned, WebDbTech, Inc ("Developer").

The parties agree as follows:

1. **Services**. Developer agrees to act as a software developer to the Company and provide its services to the Company from time to time as mutually agreed to by the parties (collectively, the "Services").

2. **Compensation**. As full and complete consideration of the Services to be rendered hereunder, the Company shall pay Developer for its Services at the agreed rate of TWO HUNDRED THOUSAND US DOLLARS ($200,000 USD).

3. **Expenses**. The Company shall promptly reimburse Developer for any reasonable costs and expenses incurred by Developer in connection with any Services specifically requested by the Company and actually performed by Developer pursuant to the terms of this Agreement. Each such expenditure or cost shall be reimbursed only if: (i) with respect to costs in excess of $50, individually, Developer receives prior approval from the Company's CEO for such expenditure or cost, and (ii) with respect to costs in less than $50, individually, provided Developer furnishes to the Company adequate records and other documents reasonably acceptable to the Company evidencing such expenditure or cost.

4. **Term and Termination**. The term of this Agreement shall continue until terminated by either party for any reason upon written notice without further obligation or liability except obligations already incurred with respect to Compensation. Notwithstanding the foregoing, to provide the parties with adequate operational lead time, they agree to provide each other with at least one (1) month's prior written notice in the event of termination.

5. **Independent Contractor**. Developer's relationship with the Company will be that of an independent contractor and not that of an employee. Developer will not be eligible for any employee benefits, nor will the Company make deductions from payments made to Developer for employment or income taxes, all of which will be Developer's responsibility. Developer will have no authority to enter into contracts that bind the Company or create obligations on the part of the Company without the prior written authorization of the Company. Similarly, the software developers assigned work pursuant to this Agreement are Independent Contractors working at the request of Developer and will not be employed by Company without prior notice to and approval by Developer.

6. **Nondisclosure of Confidential Information**.

   a. **Agreement Not to Disclose**. Developer agrees not to use any Confidential Information (as defined below) disclosed to Developer by the Company for Developer's own use or for any purpose other than to carry out discussions concerning, and the undertaking of, the Services. Developer agrees to take all reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information of the Company in order to prevent it from falling into the public domain or the possession of persons other than agents of the Company or persons to whom the Company consents to such disclosure. Upon request by the Company, any materials or documents that have been furnished by the Company to Developer in connection with the Services shall be promptly returned by Developer to the Company.

   b. **Definition of Confidential Information**. "Confidential Information" means any information, technical data or know-how of, or disclosed by, the Company to Developer (whether disclosed before or after the date of this Agreement), including, but not limited to, information relating to business and product or service plans, financial projections, customer lists, business

forecasts, sales and merchandising, human resources, patents, patent applications, computer object or source code, research, inventions, processes, designs, drawings, engineering, marketing or finance, which is indicated when disclosed to be confidential or proprietary or which information would, under the circumstances, appear to a reasonable person to be confidential or proprietary. Confidential Information does not include information, technical data or know-how that: (i) is in the possession of Developer at the time of disclosure, as shown by Developer's files and records immediately prior to the time of disclosure; or (ii) becomes part of the public knowledge or literature, not as a direct or indirect result of any improper inaction or action of Developer. Notwithstanding the foregoing, Developer may disclose Confidential Information with the prior written approval of the Company or pursuant to the order or requirement of a court, administrative agency or other governmental body.

7. **No Rights Granted**. Nothing in this Agreement shall be construed as granting any rights under any patent, copyright or other intellectual property right of the Company, nor shall this Agreement grant Developer any rights in or to the Company's Confidential Information, except the limited right to use the Confidential Information in connection with the Services.

8. **Assignment of Intellectual Property**. To the extent that Developer jointly or solely conceives, develops or reduces to practice any new inventions, original works of authorship, developments, concepts, know-how, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws or other intellectual property which would be deemed to be Confidential Information of the Company (collectively, "Intellectual Property") which clearly relates to the Company's business or technology and has been created by the Developer solely in the course of the performance of Services such as in correspondence, e-mails, meetings or meetings relating to the Company, Developer hereby acknowledges that it is "work made for hire" for the benefit of the Company and hereby assigns all rights, titles and interest to such Intellectual Property to the Company.

9. **Duty to Assist**. As requested by the Company and only with respect to Intellectual Property created by Developer for the Company as provided in paragraph 8 above, Developer shall take all steps reasonably necessary to assist the Company in obtaining and enforcing in its own name any such Intellectual Property right. Developer's obligation to assist the Company shall continue beyond the termination of Developer's relationship with the Company, but the Company shall compensate Developer at a reasonable rate after the termination of such relationship for time actually spent at the Company's request providing such assistance.

10. **Company's Right to Disclose.** The Company shall have the right to disclose the existence of this Agreement, Developer's status as an Developer, and to include Developer's name, image and profile in various promotional materials, including, but not limited to, executive summaries, private placement memo, or offering materials, and the Company's world wide web page.

11. **No Conflicts; Non-Compete**. Developer hereby represents, warrants and covenants that Developer has the right, power and authority to enter into this Agreement and that neither the execution nor delivery of this Agreement, nor the performance of the Services by Developer will conflict with or result in a breach of the terms, conditions or provisions of, or constitute a default under, any contract, covenant or instrument under which Developer is now or hereinafter becomes obligated. During the term of this Agreement, Developer shall not provide any services, as an employee, Developer or otherwise, to any person, company or entity that is (or proposes to be) a business activity that is in conflict with or directly related to the business in which the company is now involved or becomes involved during the term of this Agreement.

12. **Miscellaneous**. Any term of this Agreement may be amended or waived only with the written consent of the parties. This Agreement, including any schedules hereto, constitute the sole agreement of the parties and supersedes all oral negotiations and prior writings with respect to the subject matter hereof. The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Delaware without

giving effect to the principles of conflict of laws. This **Agreement** may be executed in counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

13. **Services**

The scope of this agreement is limited to the following services:

Software development in relation with the proposed website changes.

Assessment of the AI use in credit risk assessment.

Evaluating blockchain use in creating immutable track of the loan records and the payments.

### SIGNATURES ARE ON THE PAGE TO FOLLOW

**Signature Page**

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of __May 1st___, 2021 (the "Effective Date").

| **Anish Pabari** | **WebDbTech Inc** |
|---|---|
| By: _____ | By: _____ |
| Name: _____ | Name: |
| Title: | Title: CEO |
| Dated: _____ | Dated: _____ |

# EXHIBIT C

# Software Development Services Agreement

This Software Development Services Agreement (the "Agreement") is entered into the date set forth on the signature page by and between Jeffrey Hou Yin Ho (the "Company") and the undersigned, WebDbTech, Inc ("Developer").

The parties agree as follows:

1. **Services**. Developer agrees to act as a software developer to the Company and provide its services to the Company from time to time as mutually agreed to by the parties (collectively, the "Services").

2. **Compensation**. As full and complete consideration of the Services to be rendered hereunder, the Company shall pay Developer for its Services at the agreed rate of TWO HUNDRED THOUSAND US DOLLARS ($200,000 USD).

3. **Expenses**. The Company shall promptly reimburse Developer for any reasonable costs and expenses incurred by Developer in connection with any Services specifically requested by the Company and actually performed by Developer pursuant to the terms of this Agreement. Each such expenditure or cost shall be reimbursed only if: (i) with respect to costs in excess of $50, individually, Developer receives prior approval from the Company's CEO for such expenditure or cost, and (ii) with respect to costs in less than $50, individually, provided Developer furnishes to the Company adequate records and other documents reasonably acceptable to the Company evidencing such expenditure or cost.

4. **Term and Termination**. The term of this Agreement shall continue until terminated by either party for any reason upon written notice without further obligation or liability except obligations already incurred with respect to Compensation. Notwithstanding the foregoing, to provide the parties with adequate operational lead time, they agree to provide each other with at least one (1) month's prior written notice in the event of termination.

5. **Independent Contractor**. Developer's relationship with the Company will be that of an independent contractor and not that of an employee. Developer will not be eligible for any employee benefits, nor will the Company make deductions from payments made to Developer for employment or income taxes, all of which will be Developer's responsibility. Developer will have no authority to enter into contracts that bind the Company or create obligations on the part of the Company without the prior written authorization of the Company. Similarly, the software developers assigned work pursuant to this Agreement are Independent Contractors working at the request of Developer and will not be employed by Company without prior notice to and approval by Developer.

6. **Nondisclosure of Confidential Information**.

   a. **Agreement Not to Disclose**. Developer agrees not to use any Confidential Information (as defined below) disclosed to Developer by the Company for Developer's own use or for any purpose other than to carry out discussions concerning, and the undertaking of, the Services. Developer agrees to take all reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information of the Company in order to prevent it from falling into the public domain or the possession of persons other than agents of the Company or persons to whom the Company consents to such disclosure. Upon request by the Company, any materials or documents that have been furnished by the Company to Developer in connection with the Services shall be promptly returned by Developer to the Company.

   b. **Definition of Confidential Information**. "Confidential Information" means any information, technical data or know-how of, or disclosed by, the Company to Developer (whether disclosed before or after the date of this Agreement), including, but not limited to, information relating to business and product or service plans, financial projections, customer lists, business

forecasts, sales and merchandising, human resources, patents, patent applications, computer object or source code, research, inventions, processes, designs, drawings, engineering, marketing or finance, which is indicated when disclosed to be confidential or proprietary or which information would, under the circumstances, appear to a reasonable person to be confidential or proprietary. Confidential Information does not include information, technical data or know-how that: (i) is in the possession of Developer at the time of disclosure, as shown by Developer's files and records immediately prior to the time of disclosure; or (ii) becomes part of the public knowledge or literature, not as a direct or indirect result of any improper inaction or action of Developer. Notwithstanding the foregoing, Developer may disclose Confidential Information with the prior written approval of the Company or pursuant to the order or requirement of a court, administrative agency or other governmental body.

7. **No Rights Granted**. Nothing in this Agreement shall be construed as granting any rights under any patent, copyright or other intellectual property right of the Company, nor shall this Agreement grant Developer any rights in or to the Company's Confidential Information, except the limited right to use the Confidential Information in connection with the Services.

8. **Assignment of Intellectual Property**. To the extent that Developer jointly or solely conceives, develops or reduces to practice any new inventions, original works of authorship, developments, concepts, know-how, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws or other intellectual property which would be deemed to be Confidential Information of the Company (collectively, "Intellectual Property") which clearly relates to the Company's business or technology and has been created by the Developer solely in the course of the performance of Services such as in correspondence, e-mails, meetings or meetings relating to the Company, Developer hereby acknowledges that it is "work made for hire" for the benefit of the Company and hereby assigns all rights, titles and interest to such Intellectual Property to the Company.

9. **Duty to Assist**. As requested by the Company and only with respect to Intellectual Property created by Developer for the Company as provided in paragraph 8 above, Developer shall take all steps reasonably necessary to assist the Company in obtaining and enforcing in its own name any such Intellectual Property right. Developer's obligation to assist the Company shall continue beyond the termination of Developer's relationship with the Company, but the Company shall compensate Developer at a reasonable rate after the termination of such relationship for time actually spent at the Company's request providing such assistance.

10. **Company's Right to Disclose.** The Company shall have the right to disclose the existence of this Agreement, Developer's status as an Developer, and to include Developer's name, image and profile in various promotional materials, including, but not limited to, executive summaries, private placement memo, or offering materials, and the Company's world wide web page.

11. **No Conflicts; Non-Compete**. Developer hereby represents, warrants and covenants that Developer has the right, power and authority to enter into this Agreement and that neither the execution nor delivery of this Agreement, nor the performance of the Services by Developer will conflict with or result in a breach of the terms, conditions or provisions of, or constitute a default under, any contract, covenant or instrument under which Developer is now or hereinafter becomes obligated. During the term of this Agreement, Developer shall not provide any services, as an employee, Developer or otherwise, to any person, company or entity that is (or proposes to be) a business activity that is in conflict with or directly related to the business in which the company is now involved or becomes involved during the term of this Agreement.

12. **Miscellaneous**. Any term of this Agreement may be amended or waived only with the written consent of the parties. This Agreement, including any schedules hereto, constitute the sole agreement of the parties and supersedes all oral negotiations and prior writings with respect to the subject matter hereof. The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Delaware without

giving effect to the principles of conflict of laws. This **Agreement** may be executed in counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

13. **Services**

The scope of this agreement is limited to the following services:

- Software development in relation with the proposed website changes.
- Blockchain consultations with a prototype development capabilities.
- Mobile services for the prototype.

**<u>SIGNATURES ARE ON THE PAGE TO FOLLOW</u>**

**Signature Page**

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of __May 1st___, 2021 (the "Effective Date").

| Jeffrey Hou Yin Ho | WebDbTech Inc |
|---|---|
| By: _____<br><br>Name: ____Jeffrey Hou Yini Ho____<br><br>Title:<br><br>Dated: _May 1 2021_____ | By: _____<br><br>Name:<br><br>Title: CEO<br><br>Dated: _____ |

# EXHIBIT D

## Software Development Services Agreement

This Software Development Services Agreement (the "Agreement") is entered into the date set forth on the signature page by and between Luminor Consulting Corp. (the "Company") and the undersigned, WebDbTech, LLC ("Developer").

The parties agree as follows:

1. **Services**. Developer agrees to act as a software developer to the Company and provide its services to the Company from time to time as mutually agreed to by the parties (collectively, the "Services").

2. **Compensation**. As full and complete consideration of the Services to be rendered hereunder, the Company shall pay Developer for its Services at the agreed schedule A below.

3. **Expenses**. The Company shall promptly reimburse Developer for any reasonable costs and expenses incurred by Developer in connection with any Services specifically requested by the Company and actually performed by Developer pursuant to the terms of this Agreement. Each such expenditure or cost shall be reimbursed only if: (i) with respect to costs in excess of $500, individually, Developer receives prior approval from the Company's CEO for such expenditure or cost, and (ii) with respect to costs in less than $500, individually, provided Developer furnishes to the Company adequate records and other documents reasonably acceptable to the Company evidencing such expenditure or cost.

4. **Term and Termination**. The term of this Agreement shall continue until terminated by either party for any reason upon written notice without further obligation or liability except obligations already incurred with respect to Compensation. Notwithstanding the foregoing, to provide the parties with adequate operational lead time, they agree to provide each other with at least one (1) month's prior written notice in the event of termination.

5. **Independent Contractor**. Developer's relationship with the Company will be that of an independent contractor and not that of an employee. Developer will not be eligible for any employee benefits, nor will the Company make deductions from payments made to Developer for employment or income taxes, all of which will be Developer's responsibility. Developer will have no authority to enter into contracts that bind the Company or create obligations on the part of the Company without the prior written authorization of the Company. Similarly, the software developers assigned work pursuant to this Agreement are Independent Contractors working at the request of Developer and will not be employed by Company without prior notice to and approval by Developer.

6. **Nondisclosure of Confidential Information**.

   a. **Agreement Not to Disclose**. Developer agrees not to use any Confidential Information (as defined below) disclosed to Developer by the Company for Developer's own use or for any purpose other than to carry out discussions concerning, and the undertaking of, the Services. Developer agrees to take all reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information of the Company in order to prevent it from falling into the public domain or the possession of persons other than agents of the Company or persons to whom the Company consents to such disclosure. Upon request by the Company, any materials or documents that have been furnished by the Company to Developer in connection with the Services shall be promptly returned by Developer to the Company.

   b. **Definition of Confidential Information**. "Confidential Information" means any information, technical data or know-how of, or disclosed by, the Company to Developer (whether disclosed before or after the date of this Agreement), including, but not limited to, information relating to business and product or service plans, financial projections, customer lists, business

forecasts, sales and merchandising, human resources, patents, patent applications, computer object or source code, research, inventions, processes, designs, drawings, engineering, marketing or finance, which is indicated when disclosed to be confidential or proprietary or which information would, under the circumstances, appear to a reasonable person to be confidential or proprietary. Confidential Information does not include information, technical data or know-how that: (i) is in the possession of Developer at the time of disclosure, as shown by Developer's files and records immediately prior to the time of disclosure; or (ii) becomes part of the public knowledge or literature, not as a direct or indirect result of any improper inaction or action of Developer. Notwithstanding the foregoing, Developer may disclose Confidential Information with the prior written approval of the Company or pursuant to the order or requirement of a court, administrative agency or other governmental body.

7.   **No Rights Granted**. Nothing in this Agreement shall be construed as granting any rights under any patent, copyright or other intellectual property right of the Company, nor shall this Agreement grant Developer any rights in or to the Company's Confidential Information, except the limited right to use the Confidential Information in connection with the Services.

8.   **Assignment of Intellectual Property**. To the extent that Developer jointly or solely conceives, develops or reduces to practice any new inventions, original works of authorship, developments, concepts, know-how, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws or other intellectual property which would be deemed to be Confidential Information of the Company (collectively, "Intellectual Property") which clearly relates to the Company's business or technology and has been created by the Developer solely in the course of the performance of Services such as in correspondence, e-mails, meetings or meetings relating to the Company, Developer hereby acknowledges that it is "work made for hire" for the benefit of the Company and hereby assigns all rights, titles and interest to such Intellectual Property to the Company.

9.   **Duty to Assist**. As requested by the Company and only with respect to Intellectual Property created by Developer for the Company as provided in paragraph 8 above, Developer shall take all steps reasonably necessary to assist the Company in obtaining and enforcing in its own name any such Intellectual Property right. Developer's obligation to assist the Company shall continue beyond the termination of Developer's relationship with the Company, but the Company shall compensate Developer at a reasonable rate after the termination of such relationship for time actually spent at the Company's request providing such assistance.

10.   **Company's Right to Disclose.** The Company shall have the right to disclose the existence of this Agreement, Developer's status as an Developer, and to include Developer's name, image and profile in various promotional materials, including, but not limited to, executive summaries, private placement memo, or offering materials, and the Company's world wide web page.

11.   **No Conflicts; Non-Compete**. Developer hereby represents, warrants and covenants that Developer has the right, power and authority to enter into this Agreement and that neither the execution nor delivery of this Agreement, nor the performance of the Services by Developer will conflict with or result in a breach of the terms, conditions or provisions of, or constitute a default under, any contract, covenant or instrument under which Developer is now or hereinafter becomes obligated. During the term of this Agreement, Developer shall not provide any services, as an employee, Developer or otherwise, to any person, company or entity that is (or proposes to be) a business activity that is in conflict with or directly related to the business in which the company is now involved or becomes involved during the term of this Agreement.

12.   **Indemnification**. Except for the express representations and warranties stated in this agreement, the services and the work product of Developer are sold "as is." In all circumstances, other than a breach of Company's intellectual property rights or a breach of confidentiality, the maximum liability of Developer, its directors, officers, employees, agents and affiliates, to Company for damages for any and all causes whatsoever, and Company's

maximum remedy, regardless of the form of action, whether in contract, tort or otherwise, shall be limited to the amounts actually paid by Company to the Developer hereunder. In no event shall Developer is liable for any lost data or content, lost profits, business interruption or for any indirect, incidental, special, consequential, exemplary or punitive damages arising out of or relating to the materials or the services provided by Developer, even if Developer has been advised of the possibility of such damages and notwithstanding the failure of essential purpose of any limited remedy. Reciprocally, To the extent that any claims by a Company client , employee, or user arise, Company shall indemnify Developer and hold Developer harmless for those claims and any related losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers.

**Miscellaneous**. Any term of this Agreement may be amended or waived only with the written consent of the parties. This Agreement, including any schedules hereto, constitute the sole agreement of the parties and supersedes all oral negotiations and prior writings with respect to the subject matter hereof. The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Delaware without giving effect to the principles of conflict of laws. This **Agreement** may be executed in counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

**SIGNATURES ARE ON THE PAGE TO FOLLOW**

## Signature Page

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of __June 1st___, 2021 (the "Effective Date").

| **Luminor Consulting Corp.** | **WebDbTech LLC** |
|---|---|
| By: _____ | By: ____Dr. Adel ElMessiry_____ |
| Name: _____ | Name: |
| Title: | Title: Founder |
| Dated: _____ | Dated: _____ |

## Schedule A: Compansation

| ITEM | ESTIMATE |
|---|---:|
| **TOKEN DESIGN** | $75,000 |
| **SMART CONTRACT** | $25,000 |
| **TOKEN LOCKS** | $50,000 |
| **STAKING DESIGN** | $50,000 |
| **STAKING INTERFACE** | $50,000 |
| **TEST NETWORK DEPLOYMENT** | $25,000 |
| **MAIN NETWORK DEPLOYMENT** | $5,000 |
| | **$280,000** |

# EXHIBIT E



ESG
NEWS

COVID-
19
NEWS

SERVICES ﹀

CONTACT
US

FRANÇAIS

SIGN IN

REGISTER



# EV Battery Tech Secures Early-Stage Investment in Crypto Protocol

November 03, 2021 07:00 ET | Source: [Extreme Vehicle Battery Technologies Corp.](#)

**The Company has Secured a Seed Round Ownership Position in the ROBe² Protocol Which Has Now Had Its Patent Pending "Proof of Renewable" Mining Protocol Published**

VANCOUVER, British Columbia, Nov. 03, 2021 (GLOBE NEWSWIRE) -- Extreme Vehicle Battery Technologies Corp. (the "**Company**" or "**EV Battery Tech**") (CSE: **ACDC**) (OTCQB: **CRYBF**), is pleased to announce that it has invested in the Renewable Obligation Base energy economy protocol ("**ROBe² Protocol**").

On October 5, 2021, the Company was [accepted into the Renewable Energy Alliance](#) (the "**REA**"), and has since [commenced a collaboration with the ROBe² Protocol](#) and IONiX Pro Battery Technologies Inc. ("**IONiX Pro**"). The collaboration is intended to develop an energy storage system (ESS) utilizing the Company's patented battery management system (BMS) to create the world's first device to operate the ROBe² Protocol's patent pending Proof of Renewable mining protocol (the "**PoR Protocol**"). The PoR Protocol has the ability to both verify energy's renewable source and use a blockchain based cryptocurrency mining system that will mine the ROBe² Protocol. This milestone for the ROBe² Protocol and its PoR Protocol is particularly significant, as one of the common criticisms towards cryptocurrencies in general is the way in which they are mined.

Since the collaboration commenced, the Company and IONiX Pro have seen rapid development of the ROBe² Protocol, particularly regarding the PoR Protocol. Notably, on October 29, 2021, the PoR Protocol was published at the *International Conference on Cryptography and Blockchain* in Vienna, Austria. Some of the more advanced cryptocurrencies have published "white papers" which provide investors technical information about their



ESG
NEWS

COVID-
19
NEWS

SERVICES ⌄

CONTACT
US

FRANÇAIS

SIGN IN

REGISTER

published. The PoR Protocol academic paper is also anticipated to be published in the following journals:

- International Journal of Computer Networks & Communications (IJCNC) - Scopus Indexed, ERA Indexed
- International Journal On Cryptography And Information Security (IJCIS)
- International Journal of Security, Privacy and Trust Management (IJSPTM)
- International Journal of Network Security & Its Applications (IJNSA) - ERA Indexed
- Information Technology in Industry (ITII) New- ESCI(WOS) Indexed

"*I am honored to have this ground-breaking scientific achievement published at the International Conference on Cryptography and Blockchain,*" commented Dr. Adel El-Messiry, co-author of the PoR academic paper.

"*Having a published academic paper sets the ROBe$^2$ Protocol apart from other cryptocurrencies. We hope the innovation of the Proof of Renewable mining protocol will become the new standard in crypto mining,*" continued Dr. El-Messiry.

Through its collaboration with the ROBe$^2$ Protocol, the Company was able to participate in a unique and limited Non-Fungible-Token (NFT) offered by the ROBe$^2$ Protocol. The NFT auction for a limited amount of ROBe$^2$ Protocol NFT Bonds (each an "**NFT Bond**") took place on November 1, 2021 at 9am CST. All the NFT Bonds sold out in less than one minute. The Company is pleased to announce that it managed to secure $2,000,000 worth of NFT Bonds in this auction.

**The NFT Bonds**

Like the ROBe$^2$ Protocol, the NFT Bonds have several unique characteristics as a means of investing in cryptocurrency:

- they provide an opportunity for investors to own part of the ROBe$^2$ Protocol, pre-launch;
- their value is based on the price of the underlying token of the ROBe$^2$ Protocol;
- they automatically deposit tokens directly into the digital wallet of the owner until maturity;
- they provide the owner the flexibility to trade the NFT Bond on an NFT exchange or hold the NFT Bond and collect the tokens, or both; and
- no two are alike, making each NFT Bond completely unique.



"*This is what recently captivated the audience at the International Conference on Cryptography and Blockchain in Vienna. They were filled with awe at the possibilities as they processed the PoR Protocol,*" continued Dr. Davis.

The Company has now provided its shareholders exposure to the growth of the ROBe[2] Protocol, while it continues to work with IONiX Pro to develop the hardware for the ROBe[2] Protocol's patent pending PoR Protocol. The Company is following the lead of other tech giants that have started building cryptocurrency portfolios.

"*This is a pivotal moment in blockchain mass adoption developed through a visionary approach to solve the energy problems in our world,*" commented EV Battery Tech CEO, Bryson Goodwin.

"*We continue to increase our exposure to crypto, providing our shareholders more and more exposure to the potential upside in this forward-looking movement. As the other tech giants in our space did before us, we also intend to increase our position as we grow alongside this energy conscious cryptocurrency protocol,*" concluded Mr. Goodwin.

On behalf of the Company,

Bryson Goodwin,

Chief Executive Officer

**About the Renewable Obligation Base energy economy (ROBe[2]) Protocol**

The Renewable Obligation Based energy economy protocol, or ROBe2 (pronounced Rob-ee), is a decentralized digital currency, designed to incentivize the creation and consumption of renewable energy, by creating an obligation to generate renewable energy each time a token is mined and transacted. The ROBe2 Protocol can only be mined via a patent pending, carbon negative "Proof of Renewable" mining protocol that requires the creation of renewable energy. While the target motivations center around the creation of the most advanced decentralized utility digital currency, the larger objectives are to stimulate a global movement against climate change and economic oppression that plague our world even in this modern day of science and technology.



ESG
NEWS

COVID-
19
NEWS

SERVICES ˅

CONTACT
US

FRANÇAIS

SIGN IN 

REGISTER

that is open to everyone and where each financial transaction creates the incentive for generating renewable energy continuously and automatically.

Learn more at ROBe[2].io

**About EV Battery Tech**

EV Battery Tech is a blockchain and battery technology company with revolutionary, patented Battery Management Systems (BMS) designed to meet the growing demand for scalable, smart solutions for the rapidly growing electric vehicle (EV) and energy storage solution (ESS) markets. The company has committed to assisting global recycling solutions by offering recycling initiatives using their technology to analyze and fully refurbish used batteries.

Learn more at evbattery.tech

**About IONiX Pro**

IONiX Pro is a leading battery products and services company. Utilizing proprietary blockchain technology and patented battery management system (BMS) technology, licensed by EV Battery Tech, IONiX Pro has a growing portfolio of scalable, cutting-edge products and services for the home and office, recreational vehicles, major industrial applications and electric vehicle charging infrastructure. IONiX Pro has created disruptive "Smart" products targeted for the electric vehicle (EV) and energy storage system (ESS) markets.

Learn more at ionixpro.com

**Contact Numbers and Emails**

For Investor Inquiries, please contact (236) 259-0279 or email info@evbattery.tech.

For Product or Sales Inquiries, please contact (236) 266-5174 or email sales@ionixpro.com.

All communications are managed by AlphaOne Media Group Inc.

The CSE (operated by CNSX Markets Inc.) has neither approved nor disapproved of the contents of this press release.

**Forward Looking Statements**



ESG NEWS    COVID-19 NEWS    SERVICES ⌄    CONTACT US    FRANÇAIS    SIGN IN

REGISTER

*Canadian securities regulators. When used in this news release, words such as "will", "hope", "could", "plan", "estimate", "expect", "intend", "may", "potential", "believe", "should", "projected", "proposed", "rendering" and similar expressions, are forward-looking statements. The information in this news release includes certain information and statements about management's view of future events, expectations, plans and prospects that constitute forward-looking statements. These statements are based upon assumptions that are subject to risks and uncertainties. Forward-looking statements in this news release include, but are not limited to, statements respecting: (i) the utility and function of the ROBe[2] Protocol and the PoR Protocol; (ii) the environmental impact of the ROBe[2] Protocol and the PoR Protocol; (iii) value of the NFT Bonds ; and (iv) the future success of the collaboration between the Company, IONiX Pro and ROBe[2] Protocol. Although the Company believes that the expectations reflected in forward-looking statements are reasonable, it can give no assurances that the expectations of any forward-looking statement will prove to be correct. Except as required by law, the Company disclaims any intention and assumes no obligation to update or revise any forward-looking statements to reflect actual results, whether as a result of new information, future events, changes in assumptions, changes in factors affecting such forward-looking statements or otherwise.*

# Explore



### [Redwood Living, Inc. to build first Nebraska neigh…](#)

November 30, 2022 15:52 ET



### [Mark Burgess Named President North America, Agfa H…](#)

November 30, 2022 15:31 ET



**About Us**

GlobeNewswire is one of the world's largest newswire distribution networks, specializing in the delivery of corporate press releases, financial disclosures and multimedia content to media, investors, and consumers worldwide.

Follow us on social media:

**Newswire Distribution Network & Management**

· Home                    · RSS Feeds

· Newsroom                · Legal

GlobeNewswire is a newswire distribution network. Articles and other content published by GlobeNewswire are the legal responsibility of the author and GlobeNewswire accepts no liability for the content of such material. GlobeNewswire publishes content for informational purposes and makes no representations regarding, recommendation or invitation to engage in, any form of financial or investment activity, and does not endorse the content of any material published.

© 2022 GlobeNewswire, Inc. All Rights Reserved.